# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
No. 23-0513V

|  |  |
|---|---|
| SAMANTHA KENNEDY, | Chief Special Master Corcoran |
| Petitioner, | Filed: January 28, 2026 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Brian L. Cinelli, Schiffmacher, Cinelli Adoff, LLP, Buffalo, NY, for Petitioner.*

*Elizabeth Andary, U.S. Department of Justice, Washington, DC, for Respondent.*

**<u>RULING ON ENTITLEMENT</u>**[1]

On April 13, 2023, Samantha Kennedy filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") following an influenza vaccine she received on October 2, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons set forth below, I find that Petitioner more likely than not suffered the residual effects of her injury for more than six months, that she has provided preponderant evidence of onset within forty-eight hours, and that she has satisfied all of

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

the other requirements of a Table SIRVA claim. Petitioner is therefore entitled to compensation under the Vaccine Act.

## I.    Relevant Procedural History

On January 30, 2024, Respondent filed a Rule 4(c) Report opposing entitlement. *See* ECF No. 27. In it, Respondent denied the Vaccine Act's "severity requirement" had been met, and that Petitioner "has not preponderantly established that her shoulder pain began within forty-eight hours of vaccination." Rule 4(c) Report at 5-7. Petitioner then filed a Motion for Ruling on the Record and Brief ("Br.") on July 19, 2024. ECF No. 24. Respondent filed a response ("Resp.") on August 30, 2024 and Petitioner filed a reply ("Repl.") on October 28, 2024. ECF No. 25, 28.

The matter is now ripe for adjudication.

## II.    Factual History

### a.  *Medical Records*

Petitioner had a flu vaccine administered to her left deltoid on October 2, 2020. Ex 14 at 5. She saw her primary care provider ("PCP") 25 days later - on October 27, 2020. Ex. 4 at 3. Although the record is handwritten and difficult to read, the notes indicate "left arm pain for 1.5 weeks," (which if true might mean an onset outside the Table timeframe). *Id*. The record also states "had flu shot" in different handwriting. *Id*. Petitioner was prescribed steroids. *Id.* at 4; *see also* Ex. 5 at 11; Ex.1 at ¶8.

The following month, on November 23, 2020, Petitioner saw an orthopedist for her shoulder pain. Ex. 5 at 11. The notes indicate "left shoulder pain since *mid Sept 2020* after getting a flu shot. Her symptoms developed shortly after." *Id*. (emphasis added). The "history of present illness" section indicates that the "date of injury was 2 months" and that Petitioner "had sudden [left] shoulder pain after getting the flu shot." *Id*. Petitioner reported that the steroids had helped while she was taking them. *Id*. On exam, she had tenderness, slightly reduced range of motion, with pain at the end range, normal strength, and positive impingement testing. *Id*. at 11-12. Petitioner was diagnosed with impingement syndrome, advised to use over-the-counter NSAIDs, referred to physical therapy, and given a home exercise program. *Id*. at 12.

Petitioner began physical therapy on December 1, 2020. Ex. 6 at 2. The "history of present illness" states that Petitioner "had left shoulder pain since mid Sept 2020 after

2

getting a flu shot. Her symptoms developed shortly after."[3] *Id*. On exam, Petitioner had reduced strength in her left shoulder, reduced range of motion with pain, and positive special tests. *Id*. at 4. Treatment was planned twice a week for eight weeks. *Id*. at 6. Petitioner attended a total of 17 sessions through March 22, 2021. *Id*. at 7-57. At her last session, Petitioner reported reduced pain with movement but continued to have "mild discomfort while laying on her left side." *Id*. at 57. Her range of motion and strength had improved, and she was discharged to with "a progressive home strengthening program." *Id*.

In the meantime, Petitioner had follow-up appointments with her orthopedist on January 25 and March 5, 2021. Ex. 5 at 5, 8. She reported improvement with physical therapy and medications. *Id.* A cortisone injection was considered at the January visit, but deferred "as she [was] feeling better." *Id*. at 9. At the March 5, 2021 appointment, Petitioner reported 70% improvement, and continued to demonstrate slightly limited range of motion, "trace" pain at the end ranges, "fatigue with strength testing, and positive impingement testing." *Id*. at 5. She was advised to continue physical therapy and then transition to a home exercise program, and prescribed Mobic. *Id.* at 6.

Petitioner did not return for shoulder-related treatment until December 20, 2021 – nine months later. Ex. 5 at 2. She reported that her pain was the same as at her previous visit. *Id*. She noted that she had stopped physical therapy in April and that her "pain [was] now coming back." *Id*. Her exam was nearly identical to her previous visit, with minimal pain at the end range of motions and "trace" positive impingement testing. *Id*. She was diagnosed with impingement syndrome and referred back to physical therapy (at Petitioner's request). *Id*. at 3.

Petitioner returned to physical therapy on January 14, 2022. Ex. 6 at 58. She now reported that she had continued with her home exercises, but mild pain had returned during the "last 3-4 months." *Id*. The evaluation revealed slightly reduced range of motion and reduced strength. *Id.* at 59. Treatment was planned for 9-12 weeks. *Id*. She attended a total of 13 sessions through April 15, 2022. *Id*. at 62-88. At her last session, Petitioner was discharged, having "reached max therapeutic benefit." *Id*. at 87.

### b.  Witness Statements

Petitioner filed an affidavit as Exhibit 1. She recalled receiving her flu vaccine at the same time as her husband. Ex. 1 at ¶4. "As soon as the shot was administered, [she] felt a sharp pain in [her] shoulder." *Id.* at ¶5. She recalled discussing her shoulder pain

---

[3] Petitioner received both orthopedic care and physical therapy treatment at Orlin & Cohen Medical Specialists Group. *See* Ex. 5 at 11; Ex. 6 at 2. The history of present illness in the physical therapy records is identical to that in the orthopedist records, suggesting that Petitioner did not provide a new history (or any new history was not recorded) during her physical therapy evaluation. *Id.*

with her husband (who also experienced similar symptoms). *Id*. at ¶5-7. When she called her PCP for an appointment to address her shoulder pain, she took the later (by six days) appointment "since [her] husband's arm appeared to be worse." *Id*. at ¶7.

Petitioner stated that she treated her shoulder consistently until March 2021, when she "asked if [she] could discontinue in-person physical therapy and simply continue therapy in the form of a home exercise program." *Id*. at ¶10. She stated that her decision was due to her "work and family obligations," including "a very intense work schedule" and her husband's campaign obligations due to his re-election bid as a Nassau County legislator. *Id*. at ¶10-12. She noted that she returned to in-person treatment after the election. *Id*. at ¶13.

Petitioner's husband, James Kennedy, also filed an affidavit in support of her claim. Ex. 3. He recalled going with Petitioner to receive vaccinations on October 2, 2020, and discussing immediately after "how the shots hurt much more than flu shots [they] had received in the past." *Id*. at ¶3-4. He recalled "how difficult it was for [Petitioner] to attend physical therapy" due to her "very demanding job" and obligations to their two young children. *Id*. at 6. He noted that, as his election campaign ramped up "around April," Petitioner had "made enough improvement" to transition to a home exercise program "in an effort to meet work and family obligations and also now meet the demands of the campaign as well." *Id*. at 8. He noted that "her arm continued to bother her" and worsened, leading her to return to treatment after the election. *Id*. at ¶9.

Petitioner's mother, Lois Schmidt, lives with Petitioner in an "in-law suite." Ex. 15 at ¶2. She recalled offering to bathe Petitioner's young daughter on the evening of the vaccination because of Petitioner's shoulder pain. *Id*. at ¶5. Then, in the subsequent days, she observed Petitioner struggling with daily activities, including driving. *Id*. at ¶7, 11. Ms. Schmidt also served as a campaign manager for Petitioner's husband's bid for re-election. *Id*. at ¶10. She observed that "all of the family's schedule and obligations fell to [Petitioner]" during the campaign causing her to stop physical therapy and to "continue with just a home exercise plan." *Id*. at ¶11-12. She remembered observing Petitioner "being in pain and discomfort on a regular basis" and offering "to do more to help with [the children] than [she] had done prior." *Id*. at ¶13.

Petitioner's friend Theresa Fisher, a physical therapist, filed an affidavit in which she recalled seeing Petitioner "the weekend after" her vaccination. Ex. 16 at ¶1-3. She remembered that Petitioner "demonstrat[ed] the restrictions she was having that evening with her range of motion by showing [her] how far up she could lift her arm." *Id.* at ¶4.

Petitioner's neighbor, Jillian DiPreta, saw Petitioner the day after her vaccination at their sons' baseball event. Ex. 17 at ¶3. She remembered observing Petitioner "not being able to lift [her] arm up." *Id*. at ¶4.

Petitioner's co-worker, Samantha Maltin, also filed an affidavit in support of Petitioner's claim. Ex. 18. She stated that Petitioner had been extremely busy at work during the spring and fall of 2021 with "extremely time sensitive" tasks. *Id*. at ¶7. She noted that the company hired an additional person to take on a portion of the duties that Petitioner had been handling alone during that period. *Id*. Petitioner's executive assistant, Gretchen Souerwine, also noted Petitioner's busy schedule during that period. Ex. 19 at ¶2, 6. She recalled Petitioner being "extremely busy with numerous meetings every day, and sometimes on weekend." *Id*. at ¶6. She recalled a day in September 2021 when Petitioner show her "how [her] arm [was] still in pain and discomfort." *Id*. at ¶7.

### III.    Applicable Legal Standards

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove by a preponderance of the evidence the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19. And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998). The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events

when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery*, 42 Fed. Cl. at 391 (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Act also requires that a petitioner demonstrate that "residual effects or complications" of a vaccine-related injury continued for more than six months. Section 11(c)(1)(D)(i). A petitioner cannot establish the length or ongoing nature of an injury merely through self-assertion unsubstantiated by medical records or medical opinion. Section 13(a)(1)(A). And "the fact that a petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013V, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014).

## IV.    Findings of Fact

### A.  *Severity*

For Petitioner to satisfy the statutory severity requirement in this case, she must demonstrate that she more likely than not continued to suffer SIRVA symptoms until at least April 2, 2021 – six months after her vaccination on October 2, 2020 (when onset of her SIRVA purportedly occurred). There is no dispute that Petitioner sought treatment for her shoulder pain through March 22, 2021 – when she was discharged from physical therapy – and then did not seek treatment again until December 2021. Br. at 7-8; Resp. at 8. Respondent argues that Petitioner's discharge from physical therapy 11 days shy of the six-month mark defeats her claim. Resp at 8-9.

However, a review of Petitioner's medical records in March 2021 shows that her injury had not likely yet resolved. During her visit with her orthopedist on March 5, 2021, Petitioner continued to display slightly reduced range of motion with trace pain at the end ranges, "fatigue with strength testing," and trace positive impingement signs. Ex. 5 at 5. Additional physical therapy was planned and then a home exercise program. *Id*. at 6. Further, her prescription medication was refilled. *Id*. Although Petitioner was advised to follow up as needed, the planned treatment was expected to continue. At her final physical therapy session on March 22, 2021, although Petitioner had met her functional goals (as Respondent notes), she continued to report mild pain and had only 4+ strength with flexion and abduction. Ex. 6 at 57. Her home exercise program was focused on strengthening and she was provided equipment to assist. *Id*. Thus, it was more likely than not that, at a minimum, Petitioner's strengthening program would be necessary for enough time thereafter to meet the six-month post-onset deadline.

Petitioner also has provided a reasonable explanation for the gap in treatment between March and December 2021. As she explained, by March 2021 – after 17 physical therapy sessions – her symptoms had improved enough that she could transition to a home exercise program while she managed increased demands on her time due to her husband re-election campaign. *See* Ex. 1 at ¶10, 12; Ex. 3 at ¶8; Ex. 15 at ¶12. Although this gap does speak to severity for purposes of damages (since it suggests the injury did not demand more consistent treatment, and was thus likely mild), it does not defeat the requirement of six months of residual, injury-related sequelae.

### B.  *Onset*

Respondent next argues that Petitioner has not established Table onset (pain beginning within two days of vaccination). He contends that the record of her first visit to

7

her PCP, just over three weeks after vaccination, states "left arm pain for 1.5 weeks." Resp. at 11. However, Respondent omits the remainder of the evidence in the record regarding onset. In that same late October record, there is a notation that Petitioner "had flu shot," indicating that she had associated her pain to vaccination.[4] Ex. 4 at 3. Thereafter, Petitioner consistently linked her shoulder pain to her vaccination at every other medical appointment. *See e.g.* Ex. 5 at 11; Ex. 6 at 2.

The November 2020 record is also somewhat problematic. It notes the wrong vaccination date – mid-September, when in fact Petitioner was vaccinated October 2, 2020 – and then proceeds to identify a "date of injury" of two months prior, which again would be prior to vaccination. Ex. 5 at 11. At the same time, however, this record also links the pain to the receipt of a flu vaccine, and that onset was sudden. *Id.* Overall, I find that although this record misdates the day of vaccination, it sufficiently links the onset of pain to the vaccination event to provide evidentiary support for Petitioner's onset allegations.

In addition, Petitioner has provided affidavit testimony supporting Table onset. Petitioner recalled "a sharp pain" as soon as the shot was administered, with continued after leaving the pharmacy. Ex. 1 at ¶5. Her husband recalled discussing the shoulder pain "as [they] were walking out of the store" after receiving their flu shots. Ex. 3 at ¶4. Petitioner's mother, who lives in the same house, recalled helping with Petitioner's youngest child the evening of the vaccination due to Petitioners' shoulder pain. Ex. 15 at ¶5. And two friends of Petitioner's saw her the weekend after her vaccination (which was on a Friday) and both remembered Petitioner's complaints of shoulder pain and witnessed Petitioner's limited range of motion. Ex. 16 at ¶4; Ex. 17 at ¶3-4. Although Respondent argues that these witness statements are "less reliable" than the medical records, in this case, the records themselves contain contradictions that require clarification. *See e.g.* Ex. 5 at 11. That record history (which is repeated in all records with that provider) states "pain since mid Sept 2020 after getting a flu shot" in one section and then also that the "date of injury was 2 months" in another. *Id.* The record also states that Petitioner had "sudden" pain after her flu shot. *Id.* Although Petitioner's flu shot was on October 2, 2020 – and not in "mid Sept 2020" – the record is clear that her pain began suddenly or "shortly after" her vaccination, a fact corroborated and supported by the witness testimony.

Admittedly, this is a very close call (as there are only two objective reports of onset timing in the record, and they both are not ringing endorsements of Petitioner's allegations). But I find there is *just barely* preponderant evidence to conclude that the onset of Petitioner's pain began within forty-eight hours of her vaccination.

---

[4] The records of Petitioner's PCP are handwritten, with portions written in different handwriting without identification of the writers. *See* Ex. 4.

### V.    Ruling on Entitlement

#### A.    *Requirements for Table SIRVA*

I have found that Petitioner has preponderantly established that her pain began within 48 hours after her vaccination. 42 C.F.R. § 100.3(c)(10)(ii). Respondent has not contested Petitioner's proof on the remaining elements of a Table SIRVA.[5] *See* 42 C.F.R. § 100.3(c)(10)(i), (iv). Therefore, I find that Petitioner has provided preponderant evidence to establish that she suffered a Table SIRVA injury.

#### B.    *Additional Requirements for Entitlement*

Because Petitioner has satisfied the requirements of a Table SIRVA, she need not prove causation. Section 11(c)(1)(C). However, she must satisfy the other requirements of Section 11(c) regarding the vaccination received, the duration and severity of injury, and the lack of other award or settlement. Section 11(c)(A), (B), and (D).

The vaccine record shows that Petitioner received a flu vaccine in her left deltoid on October 2, 2020 in New York. Ex. 14 at 4-5; Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i) (requiring administration within the United States or its territories). Additionally, Petitioner has stated that she has not filed any civil action or received any compensation for her vaccine-related injury, and there is no evidence to the contrary. *See* Ex. 1 at ¶1; Section 11(c)(1)(E) (lack of prior civil award). And as noted above, I have found that severity has been established. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Therefore, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

### Conclusion

**Based on the entire record in this case, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation in this case. A separate damages order will be issued.**

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[5] Respondent argued that Petitioner had not filed sufficient pre-vaccination records for him to ascertain whether she had a history of left shoulder problems. Resp. at 12. However, Petitioner filed PCP records going back to 2017 at Exhibit 4. There is no evidence in the record that Petitioner any left shoulder issues prior to her October 2, 2020 vaccination.